**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| DAN L. BOGER, on behalf of himself and others similarly situated, | : | |
| | : | |
| | : | |
| Plaintiff, | : | Case No. 8:19-cv-01234-PX |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CITRIX SYSTEMS, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

<u>**PLAINTIFF DAN L. BOGER'S MEMORANDUM IN OPPOSITION TO DEFENDANT
CITRIX SYSTEMS, INC.'S MOTION TO DISMISS AND TO STRIKE**</u>

**INTRODUCTION**

Plaintiff Dan L. Boger ("Mr. Boger") has stated claims for Citrix's violations of the

Telephone Consumer Protection Act ("TCPA's") automated calling provisions, its Do Not Call

provisions, and for violations of the Maryland Telephone Consumer Protection Act ("Maryland

TCPA").

With respect to the TCPA's automated calling provisions, Mr. Boger has adequately

alleged that Citrix used an automatic telephone dialing system ("ATDS") under any of the

competing interpretations of that term that have arisen since the D.C. Circuit's opinion in *ACA

Int'l v. FCC*, 885 F.3d 687 (D.C. Cir. 2018).  Among other things, Mr. Boger has plausibly

alleged Citrix's use of a predictive dialer.  While the D.C. Circuit overturned portions of the

FCC's 2015 Order on the issue of when a device qualifies as an ATDS within the meaning of the

TCPA, nothing in that opinion altered the FCC's 2003 and 2008 Orders regarding the meaning of

an ATDS, including the FCC's determination that predictive dialers are ATDSs within the

meaning of the TCPA.  As a result, the Court is also bound by those unchallenged FCC rulings.

Because Mr. Boger has alleged that the devices at issue in this case are predictive dialers, the motion to dismiss should be denied.  However, even under the most restrictive interpretations of the term ATDS, predictive dialers still qualify depending on the particulars of their latent *capacities*—something courts everywhere, even in circuits that have adopted the most restrictive interpretations, have acknowledged is impossible for a plaintiff receiving a phone call to know absent discovery.

With respect to the TCPA's do-not-call provisions, Mr. Boger alleges violations of the TCPA's regulations setting forth minimum standards for maintaining internal do-not-call lists but brings those claims under 47 C.F.R. § 64.1200(e), which expressly extends those standards to calls made to cellular telephones.  Since Mr. Boger has alleged Citrix's failures to adhere to the minimum standards resulted in calls to his cellular telephone, his claim under 47 C.F.R. § 64.1200(e) may proceed.

Citrix argues that Mr. Boger's Maryland TCPA claim must be dismissed because there is a potential for duplicative damages, but this Court has already rejected that argument as premature on a motion to dismiss.  This Court has determined that the Maryland TCPA is a standalone statute that provides for different remedies than the TCPA, and that both claims may properly proceed simultaneously.

Finally, Citrix argues that under the Supreme Court's ruling in *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773 (2017), this Court lacks personal jurisdiction over it with respect to the claims of putative class members outside Maryland.  However, this argument has been unanimously rejected in the Fourth Circuit and by the vast majority of other courts to have considered the issue.  *Bristol-Myers Squibb* simply reaffirmed longstanding principles of jurisdiction in a mass action in which numerous named plaintiffs asserted a variety of state law

claims in a state court. It did not outlaw nationwide class actions, particularly not those that are premised on a federal question, as is the case here.

For the foregoing reasons, Citrix's Motion to Dismiss and Strike should be DENIED.

<u>**STATEMENT OF FACTS**</u>

Citrix sells software and related products and services for workplace productivity and uses telemarketing to promote its product and service offerings. (Doc. 1, ¶¶ 18-19.) Between September 4, 2015 and May 25, 2016, Mr. Boger received five automated calls from Citrix to his cellular telephone number, (703) 328-XXXX, promoting Citrix products and services. (*Id.*, ¶¶ 24-30.) On each of the calls, Mr. Boger noticed that there was a distinctive pause before the sales representative would come onto the line that was indicative of use of a predictive dialer. (*Id.*, ¶ 34.) Citrix uses a predictive dialer because that equipment allows for thousands of automated calls to be placed at one time, but its telemarketing representatives, who are paid by the hour, only talk to individuals who pick up the telephone. (*Id.*, ¶¶ 20-21.)

After repeatedly telling Citrix to stop calling him, Mr. Boger asked to speak with a manager about why he continued to receve telemarketing calls from Citrix. (*Id.*, ¶ 28.) Even after speaking with a manager, Citrix continued to make automated calls to Mr. Boger's cellular telephone number. (*Id.*, ¶ 29.)

Mr. Boger then sent correspondence to Citrix on June 16, 2016 asking it for any consent it may have allegedly had to call him, which he asserted did not exist, and alleging that Citrix used an automated telephone dialing system to place the calls to him. (*Id.*, ¶¶ 32, 34.) In response, Citrix confirmed that all of the call dates Mr. Boger referenced were accurate but provided no evidence of Mr. Boger's consent to the calls. (*Id.*, ¶ 33.) Citrix also made no attempts to refute Mr. Boger's allegation that an ATDS was used to make the calls. (*Id.*, ¶ 34.)

Instead, Citrix informed him that it did not intend to call cellular phones, telling him, "it's not

clear right now how a cell phone got through," as using an ATDS to call cellular telephones is

prohibited by the TCPA, but the same prohibition does not apply to calls to landlines.  (*Id.*, ¶¶ 11

(citing 47 U.S.C. § 227(b)(1)(A)(iii)), 34.)  Citrix further confirmed that according to the notes in

its database, Citrix did not add Mr. Boger's number to its do not call list until after Mr. Boger's

third request for it to do so.  (*Id.*, ¶ 33.)

## LAW AND ARGUMENT

**I.      Mr. Boger sufficiently alleges use of an ATDS**.

The TCPA provides, in relevant part:

> It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—
>
> (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice.

47 U.S.C. § 227(b)(1)(A).  The TCPA defines an ATDS as "equipment which has the capacity

— (A) to store or produce telephone numbers to be called, using a random or sequential number

generator; and (B) to dial such numbers."  47 U.S.C. § 227(a)(1).  The regulation at issue defines

an ATDS as "equipment which has the capacity to store or produce telephone numbers to be

called using a random or sequential number generator and to dial such numbers."  47 C.F.R. §

64.1200(f)(2).

The TCPA's definition of ATDS includes the disjunctive "or," meaning the definitions of

ATDS must include systems, like predictive dialers, that store telephone numbers regardless of

whether they produce numbers.  *See Duncan v. Walker*, 533 U.S. 167, 174 (2001)

("a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause,

sentence, or word shall be superfluous, void, or insignificant."); *Herman v. Hector I. Nieves*

*Transp., Inc.*, 244 F.3d 32, 36 (1st Cir. 2001) ("A primary canon of statutory construction is that a statute should be construed so as not to render any of its phrases superfluous.").  To give meaning to every word in the statute, the phrase "using a random or sequential number generator" must modify "produces numbers" because it makes no sense for a device to "store" numbers using a random or sequential number generator.  Further, if a device already has the numbers stored, there would be no need to produce the numbers.

The legislative history also shows that Congress intended to regulate list or database based dialing systems.  House Report 103-317 provides:

> While some telemarketing businesses still rely on telephone directories, printed lists of prospective customers, and manual operations, the number of such businesses is dwindling. Today, computers assist an estimated 82 percent of America's businesses conducting telemarketing campaigns. And computer assistance goes far beyond dialing the telephone number of the prospective customer and transferring the call to the next available telemarketing service representative. **The entire sales to service marketing function has been automated. Modern telemarketing software organizes information on current and prospective clients into databases designed to support businesses in every aspect of telephone sales—all with the objective of bringing the company's product or service to the customer most likely to purchase it**.

> In addition, a separate market exists to **develop and enhance telemarketing databases**. **Hundreds of companies sell customized and off-the-self software for data base applications within mainframe, mini and personal computer environments. Their telemarketing software products are designed to meet the needs of any size business.** A leading vendor of PC-based telemarketing software, for example, has sold roughly 80,000 copies of its product—over half the copies were sold to one-person businesses.

> Another market exists for companies that specialize in maintaining demographic and psychographic databases designed to provide businesses with a wealth of personal and life-style data on as many as 50 or 60 million people. **Businesses routinely purchase data from multiple sources in an effort to create unique product- or service specific databases. And, the databases can be developed from multiple starting points**: a name, address, or telephone number; a drivers license number or license plate; or a personal check or credit card number....

> In addition, industry periodicals include information and advice designed to help businesses develop telemarketing capabilities and tools, **including sophisticated**

**databases**. As an adjunct to professional journals and other literature, the Direct Marketing Association also offers instructional video and audio tapes, and conference proceedings, at nominal fees. Topics identified in the Association's catalogue include: Database Management and the Privacy Issues; Merge/Purge Methodologies—**Database Marketing** Correlations; A Marketing Managers Primer to **Database Marketing**; How to Use Outside Databases Effectively; and numerous industry-specific **database marketing** tapes.

Although the introduction of the computer has greatly increased the effectiveness and efficiency of telephone marketing, **modern telemarketing techniques and equipment do not guarantee the emergence of ethical, unintrusive telephone solicitation practices**.

House Report 102-317, 1st Sess., pp. 7-8 (emphasis added).  Congress was thus concerned about the use of list-based autodialers by telemarketers even in 1991.  It therefore drafted the ATDS definition to cover systems that *either* store *or* produce telephone numbers to be called.[1]

Mr. Boger has sufficiently pled that Citrix used an ATDS to call him, under any of the competing interpretations of that term that have arisen since the D.C. Circuit's opinion in *ACA Int'l*, 885 F.3d 687.

The TCPA defines an ATDS as "equipment which has the *capacity* (a) to store or produce telephone numbers to be called, using a random or sequential number generator; and (b) to dial such numbers."  47 U.S.C. § 227(a)(1) (emphasis added).  In 2015, the FCC affirmed a broad interpretation of the word "capacity" as including "potential ability," explaining:

[That interpretation] is consistent with formal definitions of "capacity," one of which defines "capacity" as "the potential or suitability for holding, storing, or accommodating."  Furthermore, interpreting "capacity" as limited to "current capacity" or "present ability," for which Petitioners and some commenters here argue, could create problems for enforcing the TCPA's privacy protections with regard to proving how a system with multiple functions was actually used for multiple calls.  As the Commission has previously recognized, "the purpose of the

---

[1] An alternative approach also supports Mr. Boger's position.  "The TCPA, at least before the wordy analysis of lawyers, courts, and agencies gets to it, simply prohibits 'automatic' dialing …. If equipment automatically dials numbers, it cannot be used to call cell phones."  *Hunt v. 21st Mortg. Corp.,* 2013 WL 12343953, *4  (N.D. Ala. Oct. 28, 2013) (finding "[t]here is no need for deeply technical interpretations" such as those made before the FCC).

> requirement that equipment have the 'capacity to store or produce telephone
> numbers to be called' is to ensure that the restriction on autodialed calls not be
> circumvented."

*In re Rules & Regulations Implementing the TCPA of 1991*, 30 FCC Rcd. 7961, 7975-7976

("2015 FCC Order").

Following the 2015 FCC Order, several entities challenged the FCC's definition of an

ATDS, culminating in a consolidated petition in the D.C. Circuit.  *See ACA Int'l.*, 885 F.3d at

702.  The D.C. Circuit rejected the FCC's construction, explaining that the FCC's construction of

the term ATDS was ambiguous as to whether it embraced software that could not randomly or

sequentially generate numbers:

> So which is it: does a device qualify as an ATDS only if it can generate random or
> sequential numbers to be dialed, or can it so qualify even if it lacks that capacity?
> The 2015 ruling, while speaking to the question in several ways, gives no clear
> answer (and in fact seems to give both answers).  It might be permissible for the
> [FCC] to adopt either interpretation. But the [FCC] cannot, consistent with
> reasoned decisionmaking, espouse both competing interpretations in the same
> order.

*Id.* at 702-03.

## II.     Under the 2003 and 2008 FCC Orders, there is no genuine dispute that predictive dialers are ATDSs.

In 2003, the FCC concluded that a predictive dialer is an ATDS for the purposes of the

TCPA.  *In re Rules and Regulations Implementing the TCPA of 1991*, 18 FCC Rcd. 14014,

14093, ¶ 133 ("2003 FCC Order") ("[T]he Commission finds that a predictive dialer falls within

the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of

Congress.").  The FCC affirmed that conclusion in 2008.  *In re Rules and Regulations*

*Implementing the TCPA of 1991*, 23 FCC Rcd. 559, 566, ¶ 12 ("2008 FCC Order") ("[W]e

affirm that a predictive dialer constitutes an automatic telephone dialing system and is subject to

the TCPA's restrictions on the use of autodialers.").  Contrary to Citrix's argument that a

predictive dialer must be able to generate numbers from thin air to be an ATDS, in both 2003

and 2008, the FCC concluded that predictive dialers satisfy the statutory definition of an ATDS,

whether or not they can be programmed to generate random or sequential phone numbers. *See*

2003 FCC Order, 18 FCC Rcd. at 14091-93; 2008 FCC Order, 23 FCC Rcd. at 566.

On March 16, 2018, the D.C. Circuit delivered its opinion in *ACA Int'l*, 885 F.3d 687.

Citrix appears to argue that *ACA Int'l* overturned all of the FCC's pronouncements on the ATDS

issue, but Citrix is wrong.  *ACA Int'l* reviewed only the 2015 FCC Order and did not overturn

any of the FCC's prior orders.  The following excerpts from *ACA Int'l* make this clear:

- "[A] number of regulated entities seek review of a 2015 order."  885 F.3d at 691

  (emphasis added).

- "Under the Administrative Procedure Act, we assess whether the Commission's

  challenged actions in its 2015 order were 'arbitrary, capricious, an abuse of

  discretion, or otherwise not in accordance with law.'"  *Id.* at 694 (quoting 5

  U.S.C. § 706(2)(A)) (emphasis added).

- "Applying those standards to petitioners' four sets of challenges to the

  Commission's 2015 Declaratory Ruling, we set aside the Commission's

  explanation of which devices qualify as an ATDS."  *Id.* at 695 (emphasis added).

- "The Commission's most recent effort falls short of reasoned decision making."

  *Id.* at 701 (emphasis added).

This language in the D.C. Circuit's opinion makes clear that *ACA Int'l* was limited to a review of

the 2015 FCC Order.  Multiple courts have agreed that the D.C. Circuit's opinion invalidated

only the 2015 FCC Order, leaving the 2003 and 2008 FCC Orders intact.  *See McMillion v. Rash*

*Curtis & Assocs.*, No. 16-cv-03396-YGR, 2018 U.S. Dist. LEXIS 101700, at *7 (N.D. Cal. June

18, 2018) ("*ACA International* invalidated only the 2015 FCC Order—the court discusses but does not rule on the validity of the 2003 FCC Order or the 2008 FCC Order."); *Reyes v. BCA Fin. Servs., Inc.*, 312 F. Supp. 3d 1308, 1321 (S.D. Fla. 2018) ("[N]owhere in the D.C. Circuit's opinion are the prior FCC orders overruled.  Indeed, that would have been impossible given that the time to appeal those orders had long passed…. [T]he D.C. Circuit merely said that it had jurisdiction to address the recent pronouncements and clarifications issued in 2015, not whether the 2003 and 2008 orders remained valid.").

Not only does the explicit language make clear that *ACA Int'l* affected only the 2015 FCC Order, but an analysis of the substance of the D.C. Circuit's rulings further bolsters this point.  Specifically, the D.C. Circuit found that the FCC's expanded interpretation of the word "capacity" in its 2015 Order to include a device's <u>future</u> functionality was arbitrary and capricious because, with the addition of software, "it would appear to subject ordinary calls from any conventional smartphone to the Act's coverage, an unreasonably expansive interpretation of the statute."  *ACA Int'l*, 885 F.3d at 692.

The D.C. Circuit also overturned the FCC's 2015 Order's discussion of the definition of an ATDS, but the D.C. Circuit did <u>not</u> decide that the FCC had exceeded its authority by concluding in 2003 and 2008 that predictive dialers are autodialers even if they lacked the ability to randomly or sequentially generate numbers.  *See, e.g.*, *Reyes*, 312 F. Supp. 3d at 1322 (finding that the D.C. Circuit "did not say that a predictive dialer, or any other type of device, must be able to generate and dial random or sequential numbers to meet the TCPA's definition of an autodialer.").  Rather, the D.C. Circuit simply "set aside the Commission's treatment" of "which functions qualify a device as an autodialer" because "the Commission's ruling"—singular— "fails to satisfy the requirement of reasoned decisionmaking."  *ACA Int'l*, 885 F.3d at 703.  This

setting aside of the 2015 Order's analysis of this issue did not affect the validity of the 2003 and 2008 Orders.  Thus, the D.C. Circuit did not overturn the FCC's 2003 and 2008 determinations that the defining characteristic of an ATDS is "the capacity to dial numbers without human intervention" and that although some predictive dialers cannot be programmed to generate random or sequential phone numbers, they still satisfy the statutory definition of an ATDS.  2003 FCC Order, 18 FCC Rcd. at 14091-93; 2008 FCC Order, 23 FCC Rcd. at 566.

Even if the Court ignores the FCC's 2003 and 2008 pronouncements regarding predictive dialers, the plain language of the TCPA supports a finding that predictive dialers are autodialers. The primary language to be interpreted here is the definition of "automatic telephone dialing system" as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."  47 U.S.C. § 227(a)(1).  "Because the TCPA is a remedial statute intended to protect consumers from unwanted automated telephone calls …, it should be construed in accordance with that purpose." *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1047 (9th Cir. 2017); *Parchman v. SLM Corp.*, 896 F.3d 728, 740 (6th Cir. 2018) ("the TCPA is remedial").

**III.     Even without the prior TCPA orders, a predictive dialer is an ATDS under the plain language of the TCPA and as confirmed by the Ninth Circuit Court of Appeals in *Marks v. Crunch*.**

In the wake of *ACA Int'l,* courts have adopted differing interpretations of the term ATDS. Amongst the leading interpretations are the Ninth Circuit's holding, after determining that the TCPA is "ambiguous on its face," that "the statutory definition of ATDS is not limited to devices with the capacity to call numbers produced by a 'random or sequential number generator,' but also includes devices with the capacity to dial stored numbers automatically."  *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1050-1052 (9th Cir. 2018).

The Ninth Circuit stated in *Marks*:

> The question is whether, in order to be an ATDS, a device must dial numbers generated by a random or sequential number generator or if a device can be an ATDS if it merely dials numbers from a stored list. We must also determine to what extent the device must function without human intervention in order to qualify as an ATDS….

*Id.* at 1050.

> The structure and context of the TCPA as originally enacted indicate that Congress intended to regulate devices that make automatic calls. Although Congress focused on regulating the use of equipment that dialed blocks of sequential or randomly generated numbers—a common technology at that time—language in the statute indicates that equipment that made automatic calls from lists of recipients was also covered by the TCPA.

*Id.* at 1051.

> [W]e conclude that the statutory definition of ATDS is not limited to devices with the capacity to call numbers produced by a "random or sequential number generator," but also includes devices with the capacity to dial stored numbers automatically.

*Id.* at 1052.

Citrix's contrary statutory interpretation would render swathes of the statute unexplained or meaningless. If Citrix's interpretation that only telephone numbers produced randomly from thin air, or produced sequentially from thin air, rather than generated from a stored database of inputted numbers were adopted, then a telemarketing entity could simply purchase or compile a list of every phone number in the United States and call it on each of their telemarketing campaigns without any fear of reprisal. Furthermore, it would be impossible for any caller to have a meaningful consent policy as contemplated by the TCPA, which provides: "It shall be unlawful for any person within the United States … to make any call (other than a call made … with the prior express consent of the called party) using any automatic telephone dialing system." *See* 47 U.S.C. § 227(b)(1)(A). A person could consent to such a call only by sheer coincidence. *See Marks*, 904 F.3d at 1051 ("To take advantage of this permitted use, an

autodialer would have to dial from a list of phone numbers of persons who had consented to such calls, rather than merely dialing a block of random or sequential numbers.").

Moreover, the federal government exemption for collection calls would be irrelevant if collection calls were not generally subject to the TCPA.  47 U.S.C. § 227(b)(1)(A)(iii).  Entities collecting government debt, or any debt, do not randomly call American telephone numbers from thin air seeking to collect a particular account (they call from a list of numbers they believe will either contact a debtor or assist in locating the debtor, such as the number of a neighbor or relative).  Congress was aware that courts had interpreted the TCPA to apply to debt collection calls, and of the FCC's interpretation of an ATDS, when it enacted this exemption in 2015.  *See* Pub. L. 114–74, § 301(a)(1)(A).  If it wanted to exclude equipment that automatically dials from a stored database, it could have done so, but it did not.  *See Marks*, 904 F.3d at 1052 ("Like the exception allowing the use of an autodialer to make calls "with the prior express consent of the called party," this debt collection exception demonstrates that equipment that dials from a list of individuals who owe a debt to the United States is still an ATDS but is exempted from the TCPA's strictures.").

The only statutory interpretation that gives meaning to every word in the statute and makes sense in the context of the statute as a whole is an interpretation that finds that the phrase "random or sequential number generator" modifies the phrase "produce numbers to be dialed." Under the plain language of the statute, predictive dialers dialing from a list of numbers, like the dialing systems here, both store numbers and dial such numbers.  Accordingly, they meet the definition of ATDS.

**IV.    Mr. Boger has alleged use of an ATDS even under the most restrictive interpretation of that term.**

Citrix's argument relies heavily on the Third Circuit's reasoning in *Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 120 (3d Cir. 2018).  *Marks* addresses *Dominguez*:

> Therefore, we decline to follow the Third Circuit's unreasoned assumption that a device must be able to generate random or sequential numbers in order to qualify as an ATDS.  *Dominguez ex rel. Himself v. Yahoo, Inc.*, 894 F.3d 116, 120 (3d Cir. 2018) (stating, without explanation, that the plaintiff's claims against Yahoo failed because he "cannot point to any evidence that creates a genuine dispute of fact as to whether [Yahoo's device] had the present capacity to function as an autodialer by generating random or sequential telephone numbers and dialing those numbers").  In making this assumption, the Third Circuit failed to resolve the linguistic problem it identified in an unpublished opinion in the same case, where it acknowledged that "it is unclear how a number can be *stored* (as opposed to *produced*) using 'a random or sequential number generator.'"  *Dominguez v. Yahoo, Inc.*, 629 F. App'x 369, 372 n.1 (3d Cir. 2015).  Because the Third Circuit merely provided the interpretive questions raised by the statutory definition of ATDS, its published opinion is unpersuasive.

904 F.3d at 1052 n.8.  Notably, the *Dominguez* decision does not contain a discussion, or even a mention of, predictive dialers.

Resolution of this issue of statutory interpretation, however, is unnecessary on this motion to dismiss because Mr. Boger has stated a claim under any of the competing interpretations.  He alleges, among other things, that Citrix called him using a predictive dialer, and predictive dialers may be considered autodialers under all of the intrepretations depending on the particular technological capacities of the dialing system, regardless of whether those capacities were actually used.  "There is no way for [the plaintiff] to know the technological capabilities of the device(s) used to place the calls at issue … short of [the plaintiff] learning that information in discovery."  *Whitehead v. Ocwen Loan Servicing, LLC*, No. 2:18-cv-470-FtM-99MRM, 2018 U.S. Dist. LEXIS 182386, at *11 (M.D. Fla. Oct. 24, 2018).  In particular, with respect to predictive dialers, which Citrix used here, "the difference between a predictive dialer

and an ATDS is not readily apparent to a recipient of an automated call. Such a determination requires information about the technical details of the device that the defendant used to make the calls—information that the plaintiff lacks prior to discovery. It is for this reason that a plaintiff need not provide specific, technical details about the device at issue at the pleading stage." *Zeidel v. Nat'l Gas & Elec., Ltd. Liab. Co.*, No. 18 CV 06792, 2019 U.S. Dist. LEXIS 83988, at *8-9 (N.D. Ill. May 17, 2019). *See also Shelton v. Nat'l Gas & Elec., LLC*, No. 17-4063, 2019 U.S. Dist. LEXIS 59235, at *32-34 (E.D. Pa. Apr. 5, 2019) ("[W]e cannot require a plaintiff to make allegations regarding the technical aspects of a device, including the precise level of human intervention needed to place a call, when he or she has no way of knowing those details prior to discovery."); *Wilson v. Quest Diagnostics Inc.*, No. 2:18-11960, 2018 U.S. Dist. LEXIS 212023, at *8-11 (D.N.J. Dec. 10, 2018) ("During discovery, the parties can explore the actual configuration of the dialing equipment used to call Plaintiff, as such evidence could shed light on whether Quest used a device capable of making autodialed calls"); *Battaglia v. Quicken Loans, Inc.*, No. 18-CV-1104, 2019 U.S. Dist. LEXIS 17782, at *5-6 (W.D.N.Y. Feb. 4, 2019) ("Holding plaintiffs to such a standard [to detail defendants' calling technology at the pleading stage] would make callers virtually immune to TCPA claims, which is clearly not what was intended by Congress is creating the TCPA.") (citation omitted); *Johansen v. Vivant, Inc.*, No. 12 C 7159, 2012 U.S. Dist. LEXIS 178558, at *10-11 (N.D. Ill. Dec. 18, 2012) ("[I]t is unreasonable to require a plaintiff in a TCPA complaint, without the benefit of discovery, to elaborate on the specific technical details of a defendant's alleged ATDS ….").

Rather, all the plaintiff must do at the pleading stage is make indirect allegations as to the surrounding circumstances that are sufficient to raise an inference that an automatic dialer was utilized. *Scott v. 360 Mortg. Grp., LLC*, No. 17-cv-61055, 2017 U.S. Dist. LEXIS 207513, at

*17 (S.D. Fla. Dec. 14, 2017).  Here, Mr. Boger has done far more than is required to allege an

ATDS.  He has alleged that Citrix called him using a predictive dialer and that he knew a

predictive dialer was used because he noticed a "distinctive pause before sales representatives

came onto the line that was indicative of use of a predictive dialer."  (Doc. 1, ¶ 34.)  He further

alleged that he received multiple calls (*id.*, ¶ 25), that the automated calls continued despite his

requests to the live individuals that eventually came on the line to stop calling him (*id.*, ¶¶ 28,

30), that the calls were promotional in nature (*id.*, ¶¶ 26-27), that he had not consented to receive

the telemarketing calls, and that subsequent correspondence from Citrix itself strongly indicated

to him that it used an ATDS (*id.*, ¶¶ 32-34).  Indeed, Citrix practically told him that it did.

Rather than make any attempt to deny Mr. Boger's allegation that an ATDS was used, Citrix told

him it didn't intend to call cell phones with its dialing equipment, as using an ATDS to call

cellular phones is prohibited by the TCPA, and said "it's not clear right now how a cell phone

got through."  (*Id.*, ¶ 34).  Moreover, the mere words "got through" in Citrix's statement indicate

an automated process of calling numbers in bulk.

　　　Allegations such as those Mr. Boger has made here have been found sufficient to give

rise to a reasonable inference that an ATDS was used, including by courts in the Third Circuit

under *Dominguez*, 894 F.3d 116.  *See Wilson*, 2018 U.S. Dist. LEXIS 212023, at *8-9 ("Dead air

after answering the phone is indicative that the caller used a predictive dialer.…  Thus it is

plausible that Quest used a predictive dialer to call [the plaintiff].  And since a predictive dialer

can qualify as an ATDS under the TCPA, [the plaintiff] adequately states a claim for relief.");

*Whitehead*, 2018 U.S. Dist. LEXIS 182386, at *10-11 (finding allegations "sufficient at this

stage" where the plaintiff "allege[d] Ocwen called her using an autodialer, and that [the plaintiff]

knows this 'because of the vast number of calls she received and because she heard a pause when

she answered her phone before a voice came on the line from [the defendant]'"); *Zeidel*, 2019 U.S. Dist. LEXIS 83988, at *6-9 (generic promotional messages or hearing a pause before being connected to an operator are "facts supporting a reasonable inference that the defendant used an ATDS …."); *Shelton*, 2019 U.S. Dist. LEXIS 59235, at *32 (lack of a prior relationship between the parties, geographic distance between the parties, and distinctive pause at beginning of voicemail are all allegations indicative of an ATDS and are sufficient even in the Third Circuit to state a claim under *Dominguez*); *Maes v. Charter Commc'n.*, 345 F. Supp. 3d 1064, 1070 (W.D. Wis. 2018) (ATDS adequately pled when complaint stated that plaintiff heard dead air after answering, because predictive dialers can still be autodialers after *ACA Int'l*).

The fact is that the overwhelming majority of courts to interpret the definition of an ATDS following *ACA Int'l* have held that dialing systems like the one at issue are ATDSs for purposes of the TCPA, including those outside of the Ninth Circuit.  *See Espejo v. Santander,* Case No. 11 c 8987, Dkt. No. 250 (N.D. Ill. June 12, 2019); *Gonzalez v. Hosopo Corp.*, 2019 WL 1533295 (D. Mass. Apr. 9, 2019); *Jiminez v. Credit One Bank, N.A.*, 377 F. Supp. 3d 324 (S.D.N.Y. 2019); *Duran v. La Boom Disco*, 369 F. Supp. 3d 476 (E.D.N.Y. 2019); *Adams v. Ocwen,* Case No. 18-81028, Dkt. No. 23 (M.D. Fl. Oct. 29, 2018); *Glasser v. Hilton Grand Vacations,* 341 F. Supp. 3d 1305 (M.D. Fla. 2018); *Heard v. Nationstar Mtg. LLC,* No. 2:16-CV-00694-MHH, 2018 U.S. Dist. LEXIS 143175 (N.D. Ala. Aug. 23, 2018); *Ramos v. Hopele of Fort Lauderdale,* 334 F. Supp. 3d 1262 (S.D. Fla. 2018); *Ammons v. Ally Fin., Inc.*, No. 3:17-cv-00505, 2018 WL 3134619 (M.D. Tenn. June 27, 2018); *Maddox v. CBE Grp., Inc.*, No. 1:17-cv-1909-SCJ, 2018 WL 2327037 (N.D. Ga. May 22, 2018); *Swaney v. Regions Bank*, No. 2:13-cv-00544-JHE, 2015 U.S. Dist. LEXIS 184571 (N.D. Ala. May 22, 2018); *Reyes,* 312

F. Supp. 3d 1308: *France v. DiTech Fin., LLC*, No. 8167CV3938T24MAP, 2018 WL 1695405, at *8 (M.D. Fla. Apr. 6, 2018).

Indeed, even courts in the Third Circuit have found that "predictive dialers are still considered autodialers so long as they have the present capacity—rather than a hypothetical future capacity, with the addition of software—to generate and dial phone numbers." *Shelton*, 2019 U.S. Dist. LEXIS 59235, at *29-30.  "[T]he issue is whether the calls about which [the plaintiff] complains were the product of a machine that was *capable at that time* of generating random and sequential numbers, *not whether the call to him was the result of such*." *Id.* at *30 (quoting *Might v. Capital One Bank United States, N.A.*, No. 18-716, 2019 U.S. Dist. LEXIS 21379, at *8-9 (W.D. Okla. Feb. 11, 2019) (emphasis added).  Similarly, the Court held in *Ruby v. Dish Network*, No. 18-0400, 2019 U.S. Dist. LEXIS 62472, at *2 n.1 (E.D. Pa. Mar. 25, 2019), "The Third Circuit has held that the TCPA's language is to be construed 'broadly to effect its purpose.' …  The LiveVox system is an automatic dialer that relies on numbers being loaded from a list.  It can be set to make a number of calls with a designated wait period between calls to a consumer.  The system allows businesses to program the dialer to independently make calls at a set frequency to a list of numbers without requiring a human to prompt each call.  Considering the TCPA with the requisite level of broadness, the LiveVox appears to be an ATDS for the purposes of determining TCPA liability."

Citrix cites various cases where particular dialing systems were ultimately found not to qualify as ATDSs, but many of these cases were decided on summary judgment, after the parties

had an opportunity to do discovery on the capabilities of the dialing system.[2]  As the Court in

*Whitehead* prudently explained in denying a motion to dismiss:

> [T]he courts in those cases [decided on summary judgment and cited by the
> parties in their briefs] had the benefit of evidence demonstrating what type of
> device(s) were used to call plaintiff and then applying the proper legal standard
> under the TCPA.  Here, the Court does not yet have that benefit.  Discovery of the
> nature of Ocwen's dialing system and Ocwen's contacts with Plaintiff is required
> before any definitive legal standard under the TCPA can be applied to Ocwen's
> conduct in this case.

2018 U.S. Dist. LEXIS 182386, at *11.  Indeed, "during discovery, the parties can explore the

actual configuration of the dialing equipment used to call [the plaintiff], as such evidence could

shed light on whether [the defendant] used a device *capable* of making autodialed calls."

*Wilson*, 2018 U.S. Dist. LEXIS 212023, at *8-11 (emphasis added).  *See also King v. Time*

*Warner Cable Inc.*, 894 F.3d 473, 481 (2d Cir. 2018) ("[C]ourts may need to investigate, on a

case-by-case basis, how much is needed to activate a device's autodialing potential in order to

determine whether it violates the TCPA.").  This case should therefore proceed to discovery so

that Mr. Boger may explore the particular capabilities of Citrix's predictive dialer—information

Mr. Boger has no possible way to know at this stage.

     While *Snow v. GE*, No. 5:18-CV-511-FL, 2019 U.S. Dist. LEXIS 99760 (E.D.N.C. June

14, 2019), was decided on a motion to dismiss, that case is readily distinguishable because the

plaintiff did not allege any facts that suggested an ATDS was used.  *Id.* at *11-12.  The plaintiff

did not, for example, like Mr. Boger did here, allege that the defendant used a predictive dialer,

that she received repeated generic promotional messages despite demands for them to cease, or

that the defendant essentially told her that it used an ATDS and merely did not intend for cell

---

[2] *Dominguez*, 894 F.3d at 121; *Richardson v. Verde Energy USA, Inc.*, 354 F. Supp. 3d 639, 651
(E.D. Pa. 2018); *Roark v. Credit One Bank*, No. 16-CV-173, 2018 U.S. Dist. LEXIS 193252, *7
(D. Minn. Nov. 13, 2018); *Glasser*, 341 F. Supp. 3d at 1310; *Kloth-Zanard v. Bank of Am.*, No.
15-cv-1208, 2019 U.S. Dist. LEXIS 72425, at *28 (D. Conn. Apr. 30, 2019).

phone numbers to be called with that equipment.  Moreover, the only facts the plaintiff alleged in *Snow* suggested to the court that an ATDS would not have been used.  The plaintiff in *Snow* alleged that the text messages at issue were internal technical business alerts that reached her because she was assigned a telephone number that was previously assigned to an individual who had received those alerts from GE as part of their job.  *Id.*  Here, it is unclear how Citrix got Mr. Boger's number, and he alleges he never consented to any of the telemarketing calls.  (Doc. 1, ¶ 27-32.)  Nor did Citrix provide him any evidence he or anyone else consented to the calls after Mr. Boger requested any such evidence it may have.  (*Id.*, ¶ 32-33.)

*Lord v. Kisling, Nestico & Redick, LLC,* No. 1:17-CV-01739, 2018 U.S. Dist. LEXIS 116288, at *5-7 (N.D. Ohio July 12, 2018), is similarly unlike this case because the plaintiff did not allege use of a predictive dialer, and the plaintiff's allegations were only premised on the text messaging platform at issue being able to be "*modified or programmed* to generate and dial random or sequential numbers," as opposed to having the present capacity to do so.  *Pinkus v. Sirius XM Radio, Inc.*, 319 F. Supp. 3d 927, 931 (N.D. Ill. 2018) is also readily distinguishable, as the plaintiff in that case admitted his claim rested entirely on the premise set forth in the FCC's invalidated 2015 Declaratory Ruling that a predictive dialer is an ATDS no matter what, "even if it lacks the capacity to generate randomly or sequentially telephone numbers to be dialed."  Since here, Mr. Boger has a claim under any interpretation of the TCPA depending on the particular and unknowable features of Citrix's predictive dialing system, this case should proceed to discovery.

## V.      Mr. Boger has stated a claim under 47 C.F.R. § 64.1200(d) and (e) for violation of the TCPA's internal do-not-call provisions.

A.      *Mr. Boger is not required to plead or establish that his phone is used for residential purposes to prevail on his claims under 47 C.F.R. §§ 64.1200(d) and (e) because the calls were to his cellular phone.*

The TCPA's implementing regulations prohibit any company from initiating any telemarketing call unless the company has implemented internal procedures for maintaining a list of persons who request not to be called by the entity.  47 C.F.R. § 64.1200(d).  Such internal procedures must meet certain minimum requirements to allow the entity to initiate telemarketing calls.  47 C.F.R. §§ 64.1200(d)(1)-(6).  While 47 C.F.R. § 64.1200(d) refers to residential lines, 47 C.F.R. § 64.1200(e) expressly makes those regulations "applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers …."  *See also* 2003 FCC Order, 18 FCC Rcd. at ¶ 167 ("[W]e conclude that these rules apply to calls made to wireless telephone numbers.").

Despite being specifically cited in Mr. Boger's complaint, Citrix completely ignores 47 C.F.R. § 64.1200(e) in its Motion, instead arguing that Mr. Boger's claim was brought under 47 C.F.R. § 64.1200(d), and that therefore he needed to allege that the calls to him were to a residential line.  However, numerous courts have confirmed that "although these regulations [in 47 C.F.R. § 64.1200(d)] refer to 'residential' subscribers, they apply to calls made to wireless telephone numbers, too."  *Drew v. Lexington Consumer Advocacy, LLC*, No. 16-cv-00200-LB, 2016 U.S. Dist. LEXIS 52385, at *16-17 (N.D. Cal. Apr. 18, 2016) (citing 47 C.F.R. § 64.1200(e)).  *See also Allard v. SCI Direct, Inc.*, No. 16-cv-01033, 2017 U.S. Dist. LEXIS 107106, at *13-14 (M.D. Tenn. July 10, 2017) ("Such rules [in 47 C.F.R. § 64.1200(d)] are also applicable to telemarketing calls made to cellular phones"); *Wagner v. CLC Resorts & Dev., Inc.*, 32 F. Supp. 3d 1193, 1198 n.3 (M.D. Fla. 2014) ("The rules set forth in 47 C.F.R. §§ 64.1200(c) and (d) are also applicable to wireless telephone numbers."); *Sieleman v. Freedom Mortg. Corp.*, No. 17-13110 (JBS/JS), 2018 U.S. Dist. LEXIS 129698, at *4 n.3 (D.N.J. Aug. 2, 2018) ("Section 64.1200(e), among other things, applied paragraph (d) 'to any person or entity

making telephone solicitations or telemarketing calls to wireless telephone numbers[.]'  Since

Plaintiff's case deals only with calls made to cellular phones, 47 C.F.R. § 64.1200(e) is the

relevant provision to allege a violation of the FCC's internal do-not-call list requirements.");

*Nece v. Quicken Loans, Inc.*, 292 F. Supp. 3d 1274, 1285 (M.D. Fla. 2018)

("Section 64.1200(e) extends Section 64.1200(d)'s requirements to a telemarketer's call to a

'wireless telephone number'"; however, section 64.1200(e) was not available because the

plaintiff only alleged a call to a landline.).  Mr. Boger alleged the phone number Citrix called

was a cellular phone, and that is all that is required to render him eligible to bring a claim under

47 C.F.R. § 64.1200(e).  (*See* Doc. 1, ¶ 24.)

      B.    *Mr. Boger alleged he requested not to be called far longer than 30 days before Citrix finally stopped calling him.*

Citrix blatantly misconstrues Mr. Boger's allegations as to his multiple unfulfilled

requests to Citrix to stop calling him.  (*See* Doc. 14-1, p. 9.)  It argues that Mr. Boger's first

request for Citrix to stop calling was on May 3, 2016, and that since Mr. Boger does not allege

receiving any calls 30 days after that date, Mr. Boger does not state a claim.  However, the

Complaint plainly and repeatedly states that May 3, 2016 was not Mr. Boger's first request for

Citrix to stop calling.  On May 3, 2016, Mr. Boger told Citrix that he had *previously* told it to

stop calling him, and then on the next call from Citrix, on May 25, 2016, Mr. Boger again told

Citrix that he had *previously and repeatedly* requested to be placed on Citrix's do not call list.

(Doc. 1, ¶¶ 28-30.)  Citrix itself later confirmed that *prior to Mr. Boger's request* on May 25,

2016, Mr. Boger had made *two* requests to be added to Citrix's do not call list.  (*Id.*, ¶ 33.)  Mr.

Boger has therefore alleged that his first do not call request was during the calls preceding the

May 3, 2016 call, and those calls occurred in September and December of 2015—far longer than

30 days before Citrix finally stopped calling.  (*Id.* ¶¶ 26-28.)

In any event, even if Citrix had honored Mr. Boger's do not call requests within 30 days,
Mr. Boger would still have stated a claim under Sections 64.1200(d) and (e).  Section
64.1200(d)(3) requires that do-not-call requests must be honored "within a reasonable time from
the date such request is made.  This period may not exceed thirty days from the date of such
request."  47 C.F.R. § 64.1200(d)(3).  This language provides a ceiling for what can be
interpreted as constituting "reasonable time."  It does not establish a floor.  In other words, the
regulation establishes only that calls over thirty days after a request not to call are per se
unreasonable, not the converse.  In fact, the FCC has explicitly said, "telemarketers with the
capability to honor such company-specific do-not-call requests in less than thirty days ***must do
so***."  *See* 2003 FCC Order, 18 FCC Rcd. at 14069, ¶ 94 (emphasis added).

There is no safe harbor for calls made within thirty days of a request to stop calling.
*Nece v. Quicken Loans, Inc.*, No. 8:16-cv-2605-T-23CPT, 2018 U.S. Dist. LEXIS 42356, at *18
(M.D. Fla. Mar. 15, 2018) (denying motion for summary judgment and finding that what
constitutes a "reasonable time" for honoring internal do-not-call requests is an issue of fact);
*Martin v. Comcast Corp.*, No. 12 C 6421, 2013 U.S. Dist. LEXIS 169221, at *19 (N.D. Ill. Nov.
26, 2013) (denying motion to dismiss, explaining that whether 10 days is reasonable "should be
addressed after the facts have been pinned down through discovery").

## VI.     Mr. Boger states a claim under the Maryland TCPA.

The Maryland Telephone Consumer Protection Act, Md. Code Ann. Com. Law §§ 14-
3201, *et seq.*, ("Maryland TCPA") is a "similar but distinct" statute from the TCPA.  *See Boger
v. Trinity Heating & Air, Inc.*, No. TDC-17-1729, 2018 U.S. Dist. LEXIS 64981, at *7 (D. Md.
Apr. 18, 2018) (quoting *Worsham v. Fairfield*, 981 A.2d 24, 33 (Md. Ct. Spec. App. 2009)).
While it prohibits violations of the TCPA, it also "afford[s] this additional form of recovery

unavailable under the TCPA" in that successful plaintiffs may recover attorney's fees.  *Id.* at *7.

Therefore, the Maryland TCPA "cannot fairly be construed as doing no more than authorizing a

TCPA claim" and provides for a freestanding cause of action.  *Id.*

Citrix argues that Mr. Boger impermissibly seeks a double recovery by pleading claims

under both statutes, but this argument is premature on a motion to dismiss.  When faced with an

identical argument in another case brought by Mr. Boger, *Trinity Heating & Air*, this Court, after

a detailed analysis of the history of the Maryland TCPA, found:

> This Court need not resolve the issue at this early stage of the case. As
> discussed above, the MTCPA claim will not be dismissed, at a minimum, to allow
> Boger to preserve a possible claim for attorney's fees. The elements of the TCPA
> and MTCPA claims are effectively the same, leaving the scope of discovery
> unaffected by the MTCPA claim's continued presence in this litigation. The
> question of entitlement to damages under both statutes can be addressed through
> briefing at a later stage of the case when the issue of the amount of damages must
> be decided.

2018 U.S. Dist. LEXIS 64981, at *8-9.  The amount of damages available under either or both

statutes is properly resolved prior to submission of the case to the jury.  *See id.*; *Pasco v. Protus*

*IP Solutions, Inc.*, 826 F. Supp. 2d 825, 846 (D. Md. 2011).

**VII.    This Court has jurisdiction over the claims of putative class members of the
          nationwide class who are not Maryland residents.**

Citrix argues that under the Supreme Court's ruling in *Bristol-Myers Squibb*, 137 S. Ct.

1773, this Court lacks personal jurisdiction over it with respect to the claims of putative class

members outside Maryland.  However, *Bristol-Myers Squibb* merely applied "settled principles

regarding specific jurisdiction" to a scenario unlike this case—a mass tort action in which

numerous named plaintiffs asserted a variety of state law claims in a state court.  *See id.* at 1777,

1782.  Indeed, the scenario in *Bristol-Myers Squibb* is particularly far afield from this case, a

federal class action involving a federal question.  Citrix cites various cases for the proposition

that under the reasoning in *Bristol-Myers Squibb*, nationwide class actions are barred in forums where the defendant is not subject to general jurisdiction.  However, outside of the Northern District of Illinois, courts have resoundingly rejected this argument, including in the TCPA context, with all courts in the Fourth Circuit to have considered the argument unanimously rejecting it.  *See, e.g. Morgan v. U.S. Xpress, Inc.*, No. 3:17-CV-00085, 2018 U.S. Dist. LEXIS 125001, at \*12-17 (W.D. Va. July 25, 2017) (holding that "alongside most of the courts that have encountered this issue, … that *Bristol-Myers Squibb's* holding and logic do not extend to the federal class action context") (citation omitted); *Hicks v. Houston Baptist Univ.*, No. 5:17-CV-629-FL, 2019 U.S. Dist. LEXIS 664, at \*16-18 (E.D.N.C. Jan. 3, 2019) (same); *Ross v. Huron Law Grp. W. Virginia, PLLC*, No. 3:18-0036, 2019 U.S. Dist. LEXIS 24023, at \*7-9 (S.D.W. Va. Feb. 14, 2019) (same); *Tickling Keys, Inc. v. Transamerica Fin. Advisors, Inc.*, No. 6:17-cv-1734, \*13-15 (M.D. Fla. Apr. 4, 2018) (rejecting argument in TCPA context); *Casso's Wellness Store & Gym, L.L.C. v. Spectrum Lab. Prods.*, No. 17-2161, 2018 U.S. Dist. LEXIS 43974, at \*12-14 (E.D. La. Mar. 19, 2018) (same); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp.*, No. 17-cv-00564 NC, 2017 U.S. Dist. LEXIS 155654, at \*13-16 (N.D. Cal. Sept. 22, 2017) (declining to extend *Bristol-Myers Squibb* to a class action); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, No. 09-2047, 2017 U.S. Dist. LEXIS 197612, at \*31-58 (E.D. La. Nov. 28, 2017) (same); *Molock v. Whole Foods Mkt., Inc.*, 297 F. Supp. 3d 114, 126-127 (D.D.C. 2018) (same); *Sanchez v. Launch Tech. Workforce Sols, LLC*, 297 F. Supp. 3d 1360, 1363-69 (N.D. Ga. 2018); ("*Bristol-Myers* simply reaffirms controlling due-process law and does not apply to federal class actions…."); *In re Morning Song Bird Food Litig.,* No. 12cv01592 JAH - AGS, 2018 U.S. Dist. LEXIS 44825, \*16-17 (S.D. Cal. Mar. 19, 2018); *Feldman v. BRP United States, Inc.*, No. 17-CIV-61150-DIMITROULEAS/S, 2018 U.S. Dist. LEXIS 53298, at \*14-16 (S.D. Fla. Mar. 28,

2018); *Sloan v. GM, LLC*, No. 16-cv-07244-EMC, 2018 U.S. Dist. LEXIS 21176, at \*26-38

(N.D. Cal. Feb. 7, 2018).

This Court should follow the other courts in the Fourth Circuit and elsewhere and reject

Citrix's argument.  As the court in *Hicks* aptly explained:

> While Plaintiff may end up representing other class members, this is different than a mass action where independent suits with independent parties in interest are joined for trial.  The Federal Rules of Civil Procedure themselves also highlight key differences between a class action lawsuit where one plaintiff represents multiple unnamed plaintiffs and mass tort actions brought by many different plaintiffs who are parties in interest.  Each of the factors required by the Rule 23 for a class action shows a potentially [*sic*] distinguishes a mass tort action from a class action, including 1) parties so numerous that joinder is impracticable, 2) common questions of law or fact, 3) typicality of claims of the class, 4) adequate representation by the plaintiff, are not necessarily required for a mass tort action to proceed, 5) predominance of class issues over individual issues, and 6) the superiority of a class action in resolving the issues.  Where these factors are met, plaintiff is allowed to represent individuals not party to the action, subject to additional due process considerations.   Although defendant points to other lower court decisions noting that the Rules Enabling Act prohibits modification of substantive rights, the Court in *Bristol-Myers Squibb* notes that it is "the <u>suit</u>" that must "aris[e] out of or relat[e] to the defendants' contacts with the <u>forum</u>." *Bristol-Myers Squibb*, 137 S. Ct. at 1780.  Analyzed at the level of the suit, Rule 23 does not modify the substantive rights of defendant, who is already subject to the specific personal jurisdiction of the court due to its dispute with plaintiff.

2019 U.S. Dist. LEXIS 664, at \*16-18 (citations omitted).  *See also Ross*, 2019 U.S. Dist. LEXIS

24023, at \*7-9 (utilizing this same reasoning); *Morgan*, 2018 U.S. Dist. LEXIS 125001, at \*12-

17 (same).  Accordingly, the nationwide classes here should remain intact, and Citrix's Motion

to Strike should be denied.

## CONCLUSION

For the foregoing reasons, Citrix's Motion to Dismiss and Strike should be DENIED.

Respectfully submitted,

**/s/ Stephen H. Ring**_____
Stephen H. Ring
Stephen H. Ring, PC
9901 Belward Campus Drive, Suite 175
Rockville, MD 20850
Telephone: 301.563.9249
USDC-MD Attorney No. 00405
shr@ringlaw.us

*Counsel for Plaintiff*


## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2019, the foregoing was electronically filed with the

Clerk of Courts via the CM/ECF System, which will send notification of such filing to all

counsel of record.

**/s/ Stephen H. Ring**_____
Stephen H. Ring